Counsel is going to argue if you can approach. Good move, Mr. Becker. Wow, the record reflects that he remains seated. Ms. Thorpe, good morning. Good morning. Can you state your name, please? Marcy Thorpe. Good morning, Your Honor. Matt Elster on behalf of the appellants. Okay. The usual rules apply 15 minutes per side. Leave some time for rebuttal, and if we provoke you with too many questions, we'll probably be a little more generous on the time limit, okay? And the other thing is, I'm sure you know this, but the microphone is not for amplification, it's for recording, so do your best to keep your voice up, okay? Thank you. Good morning, Your Honors. Counsel, may it please the Court. At its core, this appeal is about a rented crane, not a borrowed servant. In 2007, Ariel Rectors, plaintiff's employer, rented a crane from Jeffco, the defendant, to unload steel at an Evanston, Illinois, construction site. The plaintiff, Deirdre Hastings, was injured when the load of steel being carried by that Jeffco crane and operated by a Jeffco employee, Gregory Winbill, fell on her, breaking her leg and causing her other substantial injuries. Deirdre sued, and Jeffco moved for summary judgment. The trial court found that despite a presumption in favor of general employment in Illinois, that Winbill was a borrowed servant of Ariel, thus precluding Deirdre from recovery. It is our position that the trial court disregarded binding Supreme Court precedents, ignored material conflicts in the facts, and erred when it granted summary judgment in Jeffco's favor. Was there a contract involved in that binding precedent from the 70s, the Gundla case? I'm sorry, which case is that? That case wasn't clear on if there was a contract or not. I think presumably there was a lease, and in this case as well. Well, presumably. Right. My question is trying to solicit whether or elicit whether that court considered any lease or contract language in coming up with the decision that they did. It did not. All right. And the case that it relied on was a 1909 case talking about stevedores and winch- Well, that was a United States Supreme Court case, I believe, yes. Oh, 1909. Yes. Why is that all still good law here? Well, one, it's Supreme Court precedent. It hasn't been overruled. And I think there's a distinguishing factor here between the cases, between the Prodana case that this Court decided last year and between the Russell v. PPG case, which is a Seventh Circuit case that the trial court relied on. Those cases all involve situations where the borrowing employer rented an employee specifically. In Prodana, the plaintiff was an employer of Grossinger Toyota, I believe, who was considered a borrowed employee of Grossinger Chevy. Right. And PPG case, it was the same thing. The plaintiff was an employee of Perry who went to work for PPG, and PPG said, Mr. Perry, come here. We'd like you to come do this special project for us. And the court considered that fact when it determined that he was a borrowed servant. Yeah, I think that's a reasonable argument vis-à-vis Prodana and the other case. But the question that I have is really, should we feel all that compelled to be bound by this Gundick case if it did not involve a situation where the people who show up with the crane have a lease agreement? Well, I think you should because I think that's the key distinction, is the crane showing up as opposed to the employee showing up. Well, let's start with this. They first of all had a contract. I know you're going to say, well, it wasn't signed, and so, but if we get past that, let's assume we get past that. There's clearly an intention on the part of the parties, if it was a contract, to not only indemnify, because they have an indemnification clause in there, but also to state expressly that what was going on was that this was to be a borrowed employee, in the sense that they're saying that there would be competent personnel required to be present to direct the operation and that the area agrees to direct the employee. Well, I would question whether or not they agreed. You know, not only is there no evidence of consideration anywhere in the record. I'm saying if it was a contract, let's get past that at least for a moment. That was certainly the intention. If you start with a presumption that there was a valid contract, which I understand is an issue. Okay. But if you start with that presumption, the writing anticipated and indeed expressly said, hey, once he gets there, he's yours, doesn't it? I mean, that's what the document says, but I would argue that under PRODANIC, the existence of this contract is but one factor that this Court has to consider in determining whether or not a borrowed servant relationship exists. But the contract itself does speak to the most crucial issue in these borrowed employee cases, and that is the subject of control. And you address that on page 21 of your brief, where you quote the agreement. You say that JEFCO, quote, agrees to provide competent and experienced personnel to direct the operation of the equipment. That's not an accurate reading of the agreement, is it? JEFCO wasn't the lessee. That's correct. I think there was an error in the brief. And I think that was pointed out in your colleague's response. So, I mean, as my colleague is saying here, if there is an agreement, the agreement has language on the very issue, the most important issue in these cases, which is the right to control. But, again, I would argue that the contract is just one factor, as this Court held, one factor in determining whether or not that right to control exists. And if you look at the underlying policy behind the borrowed servant doctrine, the whole policy, according to the Restatement Third of Agency, is to allocate risk and allocate the liability to the party best situated to evaluate it. In this case, it's JEFCO was the party that hired Winn-Beal, trained him, provided him with equipments. But if the purpose of, as stated in the Restatement, is to allocate risk, is that something that can't be changed by contracting parties who say, well, okay, we understand that in the absence of an express agreement, this is how restatement says we should allocate the risk and determine who bears it. But we, as contracting parties, again, if there is a contract, agree that for the purposes of this lease, instead of what the restatement would do, we're going to allocate risk this way. Wouldn't they have that right to do that? Perhaps they would, although I believe the contract also has a provision about negligence, where I believe it says that area will not be responsible for the negligent acts of a JEFCO employee. And that's exactly what we're arguing here. That was the underlying nature of plaintiff's complaints, that her injuries are a direct and proximate cause of Winn-Beal's negligence. But that, again, speaks to the issue. It really begs the question of whether the employee is a JEFCO employee for purposes of this job or, on the other hand, becomes an area employee under the terms of the agreement. Well, I mean, once again, I mean, as I've said before, I think this, you know, the existence of agreement, as this Court has said, you know, whether or not there's a contract for hire is one factor for control. And I think the most relevant factor in the prudentic analysis is the fourth one, whether or not the loaning employer relinquished control of the equipment to the borrowing employer. As I said before, this, I believe, is a case about a rented crane, not a borrowed servant. And in the Robinson v. McDonnell-Hartman case, which I cited on page 24 of my brief, Russell v. Casey v. E.J. Catani in my reply at page 3, and even Kawaguchi v. Gaynor, a 2005 case, cited on page 6, they all adopt the test set out in Section 227 of the Restatements. And comment C of that section says, if four criteria are met, an employee remains in the general employment of his employer. The first factor, the general employee, the general employer can substitute another servant at any time. This was met here. The record indicates that Jeffco sent out two crane operators, Winbill and Greg Olson, and they were used interchangeably on the site. One was an oiler and one was a crane operator. But there was testimony that they could switch. They switched, right? They did switch, and I believe one worked in the morning, one worked in the afternoon, and that was how it worked for both days around the site. Second, the time of new employment is short. Again, the record shows that these two guys were on this site for two days and only several hours each day. This isn't a case where there's a temp agency sending somebody out for months at a time. The third factor, the loaned servant has a skill of a specialist. Once again, Winbill testified in his deposition that he had literally thousands of hours behind the controls of one of these cranes. And finally, the fact that the general employer rents out a machine of considerable value and a servant to operate it. Again, that's met here. Jeffco rented out a 90-ton, multimillion-dollar truck crane, and they sent their own experienced personnel to operate this crane. How many are they going to rent if we were to hold that the agreement doesn't control whether or not they're a borrowed employer? I mean, how many crane operators are going to be in business, you know, leasing out cranes to companies like Area that can't afford their own crane? Well, presumably the ones that hire trained employees that are non-negligent. And that's, you know, getting back to the policy underlying this whole doctrine. If Jeffco hires experienced, trained personnel, you know, they shouldn't have to worry about their guys going to this site, bouncing loads up and down, and injuring people. And isn't one of the issues here whether or not the operator of the crane, Mr. Wembley, was actually accepting Area's direction? I mean, the whole hand signal thing was an issue, but also the jib. The jib was part of the crane, was added to the crane, and the deposition testimony is that the Area employee said, no, no, we don't want that. Mr. Irizarry said, we don't want that. And the crane operator said, oh, well, too bad. We're just going to keep it. And that that was part of the reason that this load tipped over. Right. And, you know, that's, Your Honor, touched upon one of the other factors is the issue of following instructions of the alleged borrowing employer's crew. So here the Area people instructed them, we don't want this jib, and the crane operator overruled that. Well, I believe there's conflicts in the testimony. I think Irizarry said that it was ultimately Jeffco employees' decision to do it. I think Windbill said in his deposition that it was a group decision. I mean, either way, right now we're on summary judgments. I mean, any conflicts in the testimony, you know, create a question of fact that should be resolved by a jury. And with respect to the hand signals, there's significant testimony from Irizarry that even if this Court chooses to disregard Gunnar's being a 50-year-old case, Windbill still disregarded those signals. Right. But what somebody does in the breach on the job may be negligent or may be not negligent, may be in violation of the contract, may not be in violation of the contract, but does that really determine any of the legal rights or responsibilities? I think it does, Your Honor. Why? Because there's a provision in the contract that says that Jeffco will still be liable for the negligent acts of Windbill. Can we go back to the contract question again, whether or not this two-sided document? Does it really say that, or does it say that it's responsible for the negligent acts of its employees? And is it really the question whether Windbill was their employee for purposes of this job or not? I mean, for example, let's say that the negligent act was when the crane was sent over, it was sent over in the defective condition because the maintenance was negligently done. That would clearly be a situation where Jeffco's employee's negligent act could cause injury. But what you're arguing assumes the underlying thing that we're arguing about, which is whether he is the area employee or the Jeffco employee for purposes of that day on that job. Which is why I asked whether or not we need to further pursue whether this two-sided document called a lease is actually a contract. I believe we do. As I mentioned earlier, the trial court, when it granted Jeffco's motion for summary judgment, said, quote, money was exchanged. Counsel in their brief said, quote, area indirectly paid Windbill's salary. There is not a shred of evidence in the record that there was any consideration, one of the key elements of the formation of the contract. Why did they show up with the crane? Isn't that consideration? Would the crane be there without that agreement? What did Jeffco get in return? Well, we don't know where that agreement is. We haven't seen it. And there's also, I mean, there's no evidence. Are we willing to premise our decision on the fact that there is an assumption maybe out there that Jeffco is in the business of creating these contracts, hiring employees, buying these cranes, and sending them out for nothing? Is this a not-for-profit organization? I honestly don't know. I presume not. So would I. But, again, I think there's questions that remain. I mean, clearly, as Your Honor alluded to, there's got to be some other document out there, some other contract, and for this to be the end-all, be-all, I think is too presumptuous. I don't know how that creates a question of material fact as to the validity of the document that we're talking about, though. The speculation, and that's all that there is in the record, that there must be some other document out there, that they had some other agreement. You know, if that were the case, why wouldn't your client have it? Why wouldn't the crane company have it? The crane company likely does have it. I don't know why my client would. Not your client. Why wouldn't AREA have that agreement, if there's some other agreement? Presumably they do. Perhaps it wasn't produced in discovery. I can't speculate as to why. I think you're asking us to speculate a little bit on that. Well, I think you also have to look at the fact that just what happened here, there's no evidence of any bargain anywhere in the record. What happened, you know, on the day of the accident, when Bill showed up with this crane, showed up with this document. Is this the first time they ever worked with each other? You know, the record doesn't indicate one way or the other if they've worked together in the past. Really? This is the first day he was on this job. And he shows up with this document. The only signature of any AREA employee is attesting to the hours that the crane works. This is a document between a crane oiler and a construction foreman. Like, I don't believe that these are the type of people who are commonly, you know, known to negotiate leases for multimillion-dollar pieces of equipment. No, but they're probably authorized to sign them. Well, the only thing that Price signed off on were the hours worked. So it was really sort of a timesheet. Yes, absolutely, Your Honor. And presumably that's what Jeffco used to go ahead and bill AREA for its work. But this timesheet, contract, lease, document, whatever you want to call it, signed or unsigned, did indicate that the lessee was the one to provide competent and experienced personnel to direct the operation of the equipment, that the lessee was the one who was supposed to be in charge of, for lack of a better term, using the rigging properly and all of the chokers and, you know, the other equipment. That's on the lessee, not on the lessor. Right. But the lessor was the one responsible for sending somebody to actually operate the crane. And if you look at, you know, the deposition testimony of Irizarry, it's that employee's negligent act, the fact that he was disregarding hand signals, he was hillbillying it, moving too fast, causing the load to bounce, that's the proximate cause of his injury. That's in there. There's no question. There is definitely information that would suggest that there may have been negligence that caused the load to fall down and injure the plane. There's no question about that. The question is legally, it's a question of law, whose employee was the operator of the crane who allegedly was hillbillying it, as you say. Well, I think, you know, if you look at the laws in this document and you look at the other factors present in Prodanyk and A.J. Johnson Paving and all these other cases, it's too early to say as a matter of law that he was an employee of AREA. Well, it was certainly the intention of Jeffco that he be considered, I'm talking about the time of the lease, that he be considered an AREA employee when he's operating their crane, that is Jeffco's crane on the AREA job, right? Yes. So the question is whether it was effectively done and should be recognized as such under the law and not whether his acts were negligent and caused it or not because that's an issue for a different day. Okay, but those questions do not only involve what's in the lease. They also include the activities and the behavior of the parties involved. And if the operator of the crane was not following the hand signals, was not paying attention when they said we don't need the jib, was not accepting AREA's direction, then he was acting independently of AREA's cooperation. But once again, wouldn't that be a situation of whether he was an employee of one entity or the other when he was doing that which he presumably should not have done? And that's really what we're here to decide. Absolutely. And, you know, again, Your Honor, this is a case on summary judgment. We've talked about multiple conflicts in the facts already, and I think that this is a question for a jury to decide. The conflicts about whether or not the operator was negligent, those aren't questions of material fact about whether or not he was or wasn't a borrowed employee. Right, but there are. There's plenty of conflict about negligence. And there's conflict about the guy saying I followed their signals, they're saying no, he didn't. That's not really the issue that we're here to talk about. So let's get back. My colleague here, Justice Puchinsky, has some questions about the contract. Let me ask you plain and simple. Are you saying that this is not an enforceable document, contract, lease, whatever it is, because it was not signed? I'd say because it's not signed, it's not bargained for, and there's no consideration. Okay.  What about the authority that your colleague cites about the fact that, by conduct, it was basically ratified, even though it wasn't signed? I would say, again, there's no consideration present here. And the fact that it's the OBLB. How could the delivery of the crane with two human beings to operate it not be considered consideration, Mr. Elster? There's no consideration remitting back to JFCO. There's no evidence of any payment. And this is something the trial court said, contrary to the record. This wasn't pro bono. I mean, come on. Somebody got paid. Presumably, yes. Or contracted to get paid. Whether somebody's a deadbeat on the other side really doesn't factor into it. Right. But that contract doesn't exist in the record. If we get back to the issue of control, looking at the deposition testimony, it appears that there's significant differences of opinion about whether or not this crane operator was wholly controlled by the area employees. Can you talk about that for a minute? Oh, yeah. That's, I mean, as Judge Lavin was saying before about these negligent acts, not only are they an issue of negligence, they are indicators of whether or not area exercised control over this employee. Now, as I was saying before, cases like Russell, cases like Catani, cases like Kawaguchi, all four of the criteria set forth in the restatement of agency are met. Were there contracts on those cases? I think there was a lease in some of them. I don't know. I mean, the cases did not discuss the specific terms of that with those leases. You know, there's another factor that the courts in Prodentic cited was whether or not the borrowing employer had the right to discharge. This is another factor that is far from resolved. All right. I just want, before you sit down, I understand that factor. Are there any other factors that we're to look at where you can tell me what the contested material issues of fact are? Now, I understand the right to discharge. Let's skip that one and tell me whether any of the other factors, there's an issue of material fact. I'm not talking about what happened on the day, whether someone was given a signal and ignored the signal, but a fact about that would determine these factors. Okay. Well, so there's the right to discharge. There's conflicting testimony about that. Okay. I said other than that. There's the right to control. There's conflicting testimony about that. Where's the conflicting testimony of the right to control? Well, it's the fact that the only evidence of control is these hand signals, and our Supreme Court has said that that does not amount to control. Well, it's more than that. The load is here, and it needs to go over the wall and be put there. And it's going to be put on in a place where apparently it was pitched and icy and whatever. And our courts have recognized the distinction between, you know, in the Prodanyk and PPG cases where a Bowering employer tells the employee how to do his job, and I believe in paragraph 19 of Prodanyk, the court explicitly says the Bowering employer had the right to tell the plaintiff how to do his job, versus a case like this where they're just simply telling him what to do. Well, Lloyd, again, we're crossing that line that at least I find troubling between what the contractual rights are and the agreement that says you have a right to control, and indeed you, if we believe it's a contract, agree to control, and then what happens out there on that day, which could have been negligence or it could have been somebody just acting in a contrary fashion, whether he accepted the direction or not. I don't see how that issue is a material issue of fact over who had the right to control. Right, and what I'm saying here is that under Gudnitch, under these cases, ERA did not have the right to control the how, the how, not the what, the how Windmill did his job. And what facts out there that are in controversy about whether they had the right to control? That's the question I'm trying to get answered. Well, there's a testimony of Irizarry. He said, Windmill has control of the load. We only tell him where to put it, quote. And to accept this position that, you know, the what is equal to the how, I think it would lead to absurd results. I had movers come, move me into a new apartment a few weeks ago. I told them where to put boxes. I didn't tell them how to pick them up. I didn't tell them how to wrap up my furniture. And to equate one with the other, I think, is nonsensical. Did you read the agreement that you signed with the movers to see whether or not you're seriously? I did, Your Honor. You've got to be careful about this stuff, Counsel. But, you know, under Jeffko's position, my telling them where to put those boxes would essentially make me a borrowed employer. No, but not only are they telling them where to put the steel, they signed, they didn't sign, there is an agreement that said you're responsible for how you use the equipment that is provided, the rigging and how you tie up the load. You're the one who's supposed to bring in the iron workers or helpers or whoever to put the steel, connect the steel to the crane via all these things. That's all on the lessee. I mean, that's right in the contract, and that's what happened here. The crane guy shows up with the crane and his partner, the oiler, and the iron workers show up with their guys to tie it up to the crane, and they tell them park here and put it over here. They acted completely in concert or consistently, rather, with the contract. The fact that this guy may not have always listened to instructions doesn't mean he wasn't instructed, and it doesn't mean that the contract gave the area the right to direct and control the activities of the crane operator. Well, with respect to acting in concert, I mean, as our Supreme Court said again, which is the United States Supreme Court said, as a matter of law, that does not equal control on the part of the alleged borrowed employer. Without that concert, without the hand signals, there would be chaos, and that's what the U.S. Supreme Court said. That was 1909, talking about stevedores and winchmen and the complicated way longshoremen may deal with things. I agree that it's a 100-year-old case, Your Honor. Okay, but even so, in 1960, still a long time ago, our Illinois Supreme Court talked about hand signals, and they said hand signals aren't dispositive. In this case, we have not only hand signals, we have Winn-Bill's own testimony in his deposition, saying that he was the one who got to decide ultimately if he was going to lift the crane, if he was going to take a lift. And he indicated that it was he ultimately had the responsibility. So as long as he was connected so inextricably to making this decision and did not have to take the direction of the area employees, I'm having a hard time seeing how they had control over him. I agree, Your Honor. This goes back to the distinction between how versus why. In the Prodana case and PPG, in all these cases involving borrowed employees, the borrowing employer had control over why. They can say, I need you to do this. In PPG, the guy stepped into a furnace and was electrocuted, following specific orders on how to do his job. Here, Winn-Bill testified that he did not have to do that. He did not have to do any lifts. He deemed unsafe. He didn't have to do any lifts that he didn't think were rights. He had the ultimate control. He was the only one behind the wheel of this crane. Okay, if you could wrap up for us. Absolutely, Your Honors. Now, once again, this is a case about a rented crane, not a borrowed employee. Now, this is the exact situation that the drafters of the instatement revisioned when they drafted Section 227. You have a crane operator in the course of his employer's regular business who operates a crane that belongs to that employer and is sent there to protect his employer's investment. In Robinson and Casey and Guttnitz, our courts have held in almost identical situations that that employee is not a borrowed servant. And I'd like to note that in all three of those cases, Robinson, Casey, and Guttnitz, the plaintiff was allowed to present his or her claims to a jury. Deirdre never had that right. We're not asking this Court to decide in her favor. All that we are asking is that a reverse summary judgment and let her present her case to a jury. I'd like to reserve whatever time I have left for rebuttal. Thank you, Mr. Cooper. Thank you, Your Honors. Good morning. Good morning. In this case, Aria wholly took control over the crane operator, and Jeff Coe wholly relinquished its control over him. They had control over him, the right to control him, they had the right to discharge him, and the right to control was also provided by the contractor. Let me just say, let's just start with the right to discharge. That sort of presumes, in essence, the right to select and hire. This isn't a guy who showed up and said, gee, I'd like to be your crane operator. This is a guy who is, they contract to rent a crane. The crane comes with two guys attached to it, and those two guys are the ones who are going to be operating it. And they indeed did operate it. And isn't it really a legal fiction that Aria could have done anything to change the people using this crane without telling them to get that crane out of there and having to rent a crane from somebody else? If Mr. Winbill did something that was unsafe and that Aria's foreman didn't like what he was doing, he definitely had the authority and the right to say, get out of the crane. You're done. I want a new guy. Absolutely. But could he have put his own guy in that crane, one of his own employees, if he thought the guy was competent? Would he have the right to do that? Or would then the JECCO assigned people, because they're the ones who assign these two people to the job, wouldn't they have packed up that crane and walked away, ridden away in the crane? No. I think that the test, and what the cases look at, is whether the borrowing employer could call up JECCO and say, he's gone, replace him. If they have the right to do that, replace him, that equals and that's the equivalent of the right to discharge. And where is that in this purported contract, that they could say to JECCO, send us someplace, somebody else? That's in the contract. I would cite to the fact that they have exclusive jurisdiction and control over the operator. But I also would cite the testimony by Brian Price, who says, if he's doing something wrong, we're not using him. Okay. But that gets to the same thing I was having a call with Mr. Elster about, which is, what they would have tried to do is one thing. But in reality, what did they have the right to do? They didn't have the right, I would think, to put somebody else at the controls, somebody of their choice, at the controls of JECCO's crane. The contract is written, clearly is written, with the goal of trying to transfer all liability from any potential accident or wrongful act to area. But if we're looking at the reality of whether they could have said, okay, you, Winn-Deal, get out of there, I'm putting somebody else at the controls, one of my guys over here, I don't think that's going to happen. You're talking of the right to substitute as opposed to the right to discharge? Well, it would be substitute and rehire, because, again, we get to the issue of whether they actually hired this guy in the first place. It seems to me you only discharge somebody who you have hired at some point. And as I was saying in the preamble, they couldn't have picked these guys out of a lineup, I'll guess, when they came here with the crane because they probably had never seen them before, didn't know anything about it. I did want to add something in that you had asked earlier. The testimony was that JECCO has five employees. I believe we raised that in our brief. So it's a very small company. I did want to add in that. And how does that – if they have five employees, how many of them are competent to run this crane, arguably? Correct. And Mr. Jeffrey Phillips, who is the safety representative area, did testify that he has used JECCO's cranes on at least 20 other jobs in the past. They've leased the cranes from JECCO, so they do have a working relationship. And that is at page 2327 and specifically page 47 of his deposition. Ms. Thorpe, let's say that they have five employees. They probably have a president. Maybe they have a maintenance guy. Maybe they have a bookkeeper. I don't know. But let's say that they actually wanted to, quote, unquote, discharge Wendell and the guy with them. Is there evidence that there's anybody else at JECCO who would be, if JECCO was even willing to, would be competent to come over and take the control? Absolutely. There are five employees. They're all crane operators. They're all 150 labor. They all have the same rate of pay. And that's of record and that's in our brief. So absolutely. And, again, I think you're adding, if you're asking whether area can now say, oh, I want, you know, Joe Smith to sit in the crane, I don't think that's a task that equals the right to discharge. I think it's whether they can call up and say, you know what, I don't like Winfield. I want Jeff Olson. I want the guy who made up the company. I want him in the crane. I do believe they have the right to do that. And that's guided by contract. Not an area guy. The choice would still be JECCO's. To replace? Correct. From the general employer. Correct. To run the 90-ton crane. And there's testimony. What about this contract? I mean, why should we uphold the trial court saying that this is a loaned employee situation on the basis of this pretty skimpy documentary evidence we have? How do you get around the fact that the documentary evidence that you have, contract, lease, whatever it is, isn't signed? How do you get around that? All right. I think I would disagree with the fact that it's pretty skimpy. Okay. The terms and conditions are quite extensive, and they're written out. And it's a one-page document. It's handed to them. Based on the landmark case, the conduct shows that these two parties had a mutual intent to perform pursuant to the contract. And then on the other side, even though it looks skimpy, what we have is we have the location. We have the dates. We have the hours written in. We have who is there from JECCO. We have Brian Price, who is the foreman, who is an agent of area employees. So it's entirely consistent with what actually happened? It's entirely consistent. It identifies the equipment. It identifies the operators. And then there's also the affirmation by area regarding the hours and the times. So absolutely. What's all this chatter about whether or not there's some other agreement out there? There was reference made to it in the hearing. There's reference made to it in the briefs here. What's your position on that? My position is that it's sheer speculation. This does contain an integration clause that says that this is the only contract. So that would be the first thing I'd look at. There's no other evidence of any oral agreement or any other type of contract or bid of record. And, again, these people have a course of dealing. They've had the crane 20 times at least with just this one safety rep there. So I think it's just outside of the record. There is none. And what about Gundic, which I think counsel is relying on heavily, the Illinois Supreme Court case that talks about the U.S. Supreme Court case from 1909? Well, Gundic is interesting because it seems like the only evidence in favor of the alleged loaning employer was that there were hand signals. He told them what to do, where to go. And what the Supreme Court was looking at was a reversal and a JNOV entered by the appellate court. So based on that standard and only hand signals, and on the other hand they had in favor of the borrowing employer that only the loaning employer had the right to discharge and hire and fire. And that was undisputed. So the control remained with the borrowing employer, and they looked at the test of whether they wholly relinquished it. Having a hand signal doesn't wholly relinquish control, or isn't per se enough to take over the control by the borrowing employer. And in this case also we have the addition of hand signals. It wasn't just, oh, come on the site and go over there. I'll help you. I'll tell you if you're going to hit something. It was he couldn't see the majority of the load. He had the bulkhead in front of him. Yeah, he couldn't see them rigging it. The first time they lifted it for their inspection he couldn't see that. So if it was completely a visible circumstance where he didn't really need it, but people gratuitously giving hand signals, like sometimes people do when you're trying to parallel park or something like that, some stranger tries to do it, would that be of the same significance, or are we to look at it only in the context of the facts of this case? No, I don't think you have to look at it in the context of this case. I think I'll add on to that because there are plenty of crane operator cases or heavy machinery operator cases where the crane operator, say he could see, does have control over the technical details of his work, and that's the language that Your Honor used in Predannick. So whether he has control over the technical details does not take away from a borrowing employment situation. But you have Winfield saying that basically he decides whether he does this load or not, and whether he lifts it or not, and he can ignore the hand signals if he wants. So the question is if he's assigned by Jeffco his long-term, shall we say, employer, the ones who make his pension contributions and give him his pay on most days, and they send him over, and he goes over there with the belief, based upon his years of experience and work with Jeffco, that he's free to ignore all of that if he thinks it's not something that makes sense, is control anything else other than illusory from Aria's point of view? No. The fact that he said I can do whatever I want and follow hand signals, I don't think that's part of the record. But he says I'll decide whether the lift is. Okay. So then just because a crane operator has the right to say I'm not going to do something unsafe again does not take away from a borrowing employment situation, and that's been talked about in bituminous casualty. They talked about it in AJ paving. Bituminous was a declaratory judgment. Hate, directed verdict, involves crane operator, again, not having to do anything unsafe. Wilfong, summary judgment, crane operator, heavy equipment operator. So, again, to say I'm not going to do something unsafe does not take away from this. It's taken away from a prior effect, and really what we're arguing about here is whether there are absolutely no material issues of fact, and so we're free to make a determination as a matter of law on these uncontested issues, whether he was or was not a borrowed employee. So why don't you address yourself, if you can, to why we shouldn't be concerned about the existence of particular issues of fact in this case. The issues of fact that have been raised, if we assume that there are issues of fact regarding contradictions in the testimony, they don't, again, go to take away from the right to control the manner of the work, the right to discharge, and the contract terms. And I do want to add in one other thing about the agency. I just wanted to point out, in the reply, they mentioned that we didn't address the second restatement of agency. That's been superseded by the third, and that was in 05 or 06. Keep your voice up. It's been superseded, and so the third restatement of agency does not contain that same inference, that general employment continues based on certain factors. And it's removed that, and it's actually criticized the second restatement for being inconsistent in its application. So I do believe that the third restatement does favor our position as well, in that area had the control, and they also were able to prevent against risk. And if he was doing something unsafe, they could have stopped them. They had that right. And there was no material fact that if he was doing something that they didn't want him to do, they could have stopped him. Is that the only way they could have, quote, unquote, discharged him, is if he was doing something that they thought was unsafe? No. They had rights and jurisdiction and control over him. If they didn't like him, they could, like I said, call up Jeff Coe and have him replaced. Or he didn't even have to call him up. They could have kicked him out, and there was another one there already, already on the job. All right. Unless there are any further questions, we just ask to do it from the trial court. Thank you. Thanks, counsel. I'd like to begin talking about the restatement. You know, the restatement, second of agency, may have been superseded, but there's been no Illinois case that has said so. There are three Illinois cases, you know, as recently as 2005, Kawaguchi, the year that the third restatement was enacted, that cited approvingly the second restatement in its four-part test. If you want to look at the third restatement, though, it says, quote, liability should be allocated to the employer in the better position to take measures to prevent the injury suffered by the third party. There can be no dispute that that employer is Jeff Coe here. It was in the position to train Winfield, it paid his wages, it selected him, presumably it insured him, and it sent him out to this job site. You know, counsel mentioned the Illinois Supreme Court case of A.J. Paving, which I believe this court relied on in Prodanyk, and that case is distinguishable in a number of respects. First of all, the court was asked to review a decision of the Industrial Commission, which is a manifest way to the evidence standard. He overran to no vote. Secondly, it's important to note that the fourth factor in Prodanyk, whether or not the lending employer surrendered control of its equipment, no question that that factor was met there. The facts showed that the owner of the equipment lent its – stored its equipment at the borrowing employer's facilities. The borrowing employer's employees delivered it to the site and they actually worked on the equipment when the plaintiff was injured. Accordingly, there was no question that control was surrendered of that piece of equipment. Here, the opposite is true. Winfield and Olson were the only people to touch this crane. No area employee had any say in how it was operated. They simply did the hand signal, say, I want this steel brought from this point to this point. Now, counsel touched on the right to discharge, and I'd like to quote Price's testimony. He said, I don't know that we could tell them off the job site. We would call somebody else and lease a different crane. And this is what this case is all about. They leased a crane. Now, as your honors touched on before, they didn't go to Jeffco and say, you know what, we want that guy, we want that guy. They said, we need a specific piece of equipment for a specific job. They had no expectation at all that somebody would show up to operate it? Of course they did. Well, then how can you say it's about leasing a crane? It's a combo plan. You get the guys to operate it, too. But the guys to operate it are fungible. They didn't care if they got Winfield, they got Olson, or they got any of the other three employees for Jeffco. They just needed somebody who knew how to operate this crane and move from point A to point B. If they're fungible, so is the crane. I mean, everything's fungible here. So are the iron workers. Bring me five more guys from the hall. I mean, everybody's fungible. Absolutely. But under the restatement, that's one of the key factors for whether or not a general employment relationship continues. The first factor, whether the general employer can substitute another servant at any time. I think counsel just admitted to this. What does the restatement say about contractual relationships? Can the areas of the world agree to contract with the Jeffcos of the world to figure out who's going to be responsible for the conduct of whatever employees are out there working? Can't private parties do that? I think they can, Your Honor. But I think that's, you know, whether or not they did here is still important. I don't think they did it effectively here, but you acknowledge that they have the right to do it. I believe they tried. I'm sure they have the right to. But whether they did, I think, is a question for the jury, as is all of this. You have all these different factors for control, whether or not there were linkage control of their equipment, whether or not the barred employee followed the employer's instructions, whether or not there was a right to discharge. You know, Jeffco may very well prevail in front of a jury, but I think in this case, there's significant questions of fact, questions of law, unanswered, that should preclude the entry of summary judgments. This is a case for a jury, Your Honors. Okay. Thank you. Thank you. Thanks for the briefs and the arguments. We will take the matter under advisement and get back to you directly. Thank you very much. Fine job by both sides. Thank you very much.